2010 Ark. 64

**Angie FLETCHER, Appellant,**

v.

**Kevin SCORZA, Appellee.**

**No. 09–561.**

Supreme Court of Arkansas.

Feb. 12, 2010.

Rehearing Denied March 18, 2010.

just want to make sure she ends up upholding her part of the deal, and if she does, I'll grant whatever you all agree to."

Dana A. Reece, Little Rock, for appellant.

Carol D. Nokes, Little Rock, for appellee.

PAUL E. DANIELSON, Justice.

Appellant Angie Fletcher appeals from the circuit court's order appointing appellee Kevin Scorza guardian of J.F., a minor. Ms. Fletcher first appealed the circuit court's decision to our court of appeals, which reversed the order of guardianship. *See Fletcher v. Scorza*, 2009 Ark.App. 372,

2009 WL 1232100 (unpublished). Mr. Scorza petitioned this court for review, which we granted. When we grant a petition for review, we consider the appeal as though it had originally been filed in this court. *See Roberts v. Roberts,* 2009 Ark. 567, 349 S.W.3d 886. Ms. Fletcher's sole point on appeal is that there was insufficient evidence to support Mr. Scorza's third-party petition for guardianship. We affirm the circuit court's order.

On January 3, 2008, Mr. Scorza filed an amended petition for the appointment of a guardian over the person and estate of J.F. The petition stated that J.F. was ten years old and that Mr. Scorza was "interested in obtaining guardianship of the named incapacitated person |₂by reason of the petitioner's eight (8) year in loco parentis relationship with the incapacitated person and because the biological parents of the incapacitated person have not been able to care for him or have not been willing to care for him." On January 7, 2008, Mr. Scorza filed a petition for ex parte emergency relief, and that same day, the circuit court entered an order appointing Mr. Scorza temporary guardian of J.F. and scheduling a hearing on whether the temporary guardianship would continue.

On January 10, 2008, the circuit court held that hearing. Mr. Scorza testified that J.F. was the son of Ms. Fletcher, who was the mother of his two other children.[1] He testified that he, along with J.F. and his other two children, first came to Arkansas from New Orleans in 2005, due to Hurricane Katrina, and stayed because they could not return after the hurricane. He testified that in December 2007, Ms. Fletcher called him, told him that she had finished school, and requested that the children come back to New Orleans to be with her. He further testified that J.F.

had lived with him since August 2005 and that he had been J.F.'s sole provider since then. He stated that although Ms. Fletcher had not provided any financial support to him, she had purchased gifts for the children at Christmas and on their birthdays. He further stated that he had been paying Ms. Fletcher child support since 2005 for their two children, but that the payments had recently ceased.

Mr. Scorza testified that two or three weeks after his child-support obligation ceased, |₃Ms. Fletcher asked for the children to come back to New Orleans and, then, she came and got them. Mr. Scorza testified that Ms. Fletcher then called him and asked him to "pack up all their clothing." He further testified that Ms. Fletcher refused to tell him where she was living or where the children would be going to school.

With respect to J.F.'s natural father, Mr. Scorza testified that he did not know who he was, had never met him, nor did he know his name. He testified that to his knowledge, J.F.'s natural father had never provided any support for J.F., nor attempted to contact him. Mr. Scorza stated that he came into J.F.'s life in 1999, when J.F. was slightly older than one year.

Mr. Scorza testified that he lived with Ms. Fletcher and J.F. from 1999 until the beginning of 2005. He testified that after moving out, he had all three children on the weekends and overnight, because Ms. Fletcher had started working overnight. He stated that the arrangement continued until he moved out of New Orleans because of the hurricane.

Mr. Scorza testified that J.F. had never lived apart from his half-siblings and that the three children had a close relationship. He testified that J.F. was currently en-

---

1. The record reflects that J.F., who is not Mr. Scorza's biological child, has two half-sib-

lings, whose father is Mr. Scorza and whose mother is Ms. Fletcher.

rolled in school and was battling a learning disability, for which he was receiving special tutoring. Mr. Scorza further stated that J.F. had medical insurance coverage here in Arkansas, through ARKids, and that Mr. Scorza had covered all remaining expenses. He also testified that he and his mother provided J.F.'s religious instruction, although he was unable to recall the name of the church that they attended. On cross-examination, Mr. Scorza testified that the last order entered in Louisiana gave Ms. Fletcher custody of the children and required him to pay child support to her; however, the circuit court clarified that there was no order in place for J.F.

Ms. Fletcher also testified. She stated that she currently lived in Metairie, Louisiana, and that she had not previously provided that information to Mr. Scorza. She testified that the child support she had received from Mr. Scorza had been returned to him by means of purchasing items for the children or by transfer into one of his bank accounts. She further testified that she would send items for J.F. that she knew were needed on a regular basis, such as clothing, shoes, and money. She testified that when Mr. Scorza called her to request extra money, she would do her best to send it.

She also testified that she spoke with Mr. Scorza's mother about coming to pick the children up in December. She stated that she often tried to call the house to speak to the children, but no one would answer. She testified that when she then called from a different number than her own, someone would answer the phone. She stated that she did not need Mr. Scorza to serve as a guardian of J.F. and that J.F. did not need Mr. Scorza to be his guardian. She testified that she was in a position to provide for J.F., as she had recently graduated from nursing school and had accepted an offer as a beginning

registered nurse. On cross-examination, Ms. Fletcher testified that she had been to Arkansas nine or ten times to see the children. She testified that she was currently living with her fiancé and that they slept in the same room together when the children were there.

At the conclusion of the hearing, the circuit court continued the order of temporary guardianship in favor of Mr. Scorza for ninety days. On April 15, 2008, the circuit court held a hearing regarding a permanent order of guardianship. During that hearing, Mr. Scorza's mother, Barbara, testified that Mr. Scorza and Ms. Fletcher moved in together in 1998 or 1999 in New Orleans, Louisiana. She testified that Mr. Scorza moved back in with her in 2005 and that, at that time, the children would spend the weekends with them. She testified that, several months later, they also started spending the nights throughout the week with them. She testified that this arrangement continued for a few months until they fled New Orleans.

Mr. Scorza testified that he "broke up" with Ms. Fletcher in 2003. He testified that, at that time, the children came over for the weekends, but, in 2005, the children began coming over at night, when Ms. Fletcher started working overnight. He stated that Ms. Fletcher would pick the children up in the morning, take them to school, pick them up from school, and bring them to him around 9:00 p.m. Mr. Scorza acknowledged that Ms. Fletcher sent birthday and Christmas gifts to J.F. and that she called the children "every single day." He further testified that it was about six or seven months prior to Katrina that he began watching the children overnight while Ms. Fletcher worked.

Ms. Fletcher also testified, stating that she was a lifelong resident of New Orleans and that both she and Mr. Scorza lost their respective homes during Katrina. She

testified that because she was in law enforcement at the time of Katrina and was required to stay, she and Mr. Scorza agreed that he would take the children and flee the city. She testified that they thought that the relocation would be temporary, but that Mr. Scorza found somewhere to live and somewhere for the children to go to school. She stated that because the children's school in New Orleans had been destroyed and its school system was in disarray, she agreed with Mr. Scorza that it was in the best interest of the children to be in school in Arkansas.

Ms. Fletcher testified that while Mr. Scorza was with the children in Arkansas immediately following Katrina, she lived at New Orleans's City Hall for a week and a half and then lived on a cruise ship for approximately seven months. During that time, she said, she received a letter from a nursing school notifying her of her admission thereto in April. She testified that she and Mr. Scorza agreed that he would keep the children until she was able to finish school "to better the situation for the children." She testified that she graduated in December 2007 and that when she asked Mr. Scorza to prepare the information needed to register the children in the New Orleans schools, he refused.

Ms. Fletcher testified that she was currently an orientee staff nurse and that she worked three days a week in twelve-hour shifts. She testified that she would adjust her schedule as needed when J.F. was returned to her. She testified that she referred to Mr. Scorza as J.F.'s father and that J.F. considered him his father.

On April 17, 2008, the circuit court issued a letter opinion, setting forth the issues and its determination thereof. On May 2, 2008, the circuit court memorialized that letter opinion in its order appointing Mr. Scorza guardian of J.F.'s person and estate. In it, the circuit court made the following pertinent findings:

3. Angie Fletcher is the natural mother of [J.F.]. Petitioner, Kevin Scorza, is not related by blood to [J.F.], but stands *in loco parentis* to [J.] having acted as the only "father figure" [J.] has ever known. Mr. Scorza is not a true third-party petitioner seeking guardianship of [J.]. Kevin Scorza treats [J.] as his son, and [J.] views Mr. Scorza as his father. Angie Fletcher acknowledges this relationship. Mr. Scorza is not someone who can provide extra financial benefits and a lifestyle in excess of that offered by the natural mother. Mr. Scorza and Ms. Fletcher are on equal footing financially. This Court considers Mr. Scorza as an equal to the natural mother in his relationship with [J.].

4. In August 2006, due to the threat of Hurricane Katrina, Kevin Scorza evacuated New Orleans with [J.F.] and two other minor children born to Angie Fletcher and him, namely, [A.S.] and [K.S.]. Ms. Fletcher agreed that Mr. Scorza should leave New Orleans with [J.]. Initially, the parties believed the evacuation would only be for a few days, but after Hurricane Katrina struck New Orleans, it became apparent to the parties that the evacuation would be for an extended period of time. [J.F.] remained in Petitioner's care by agreement of Angie Fletcher.

5. Angie Fletcher worked in law enforcement at the time of Hurricane Katrina and as a condition of her employment, was required to remain in New Orleans after the hurricane. By the end of 2005, Ms. Fletcher could have come to Arkansas and retrieved her children but chose to remain in New Orleans and leave [J.] to the care of Mr. Scorza.

6. Ms. Fletcher left [J.] in Mr. Scorza's care by agreement from August of 2005 until December of 2007 when she came to North Little Rock and took all three children from Mr. Scorza's home. Ms. Fletcher took [J.] with no notice to Mr. Scorza but with the understanding [J.] would be returned to Arkansas after the Christmas Break from school. Ms. Fletcher informed Mr. Scorza shortly after Christmas 2007 that the children would not be returning to Arkansas.

7. From August 2005 to the present, Kevin Scorza has provided and met [J.]'s educational needs and his medical and dental needs. Mr. Scorza and his mother, Barbara Scorza, have provided [J.] with religious training and have attended church regularly with him since January 2007.

8. Prior to August 2005 and until late fall, 2007, Kevin Scorza paid child support of $367.00 a month to Angie Fletcher for the support of [A.S.] and [K.S.]. Ms. Fletcher provided money for birthdays, Christmas presents, and on occasion at the request of Mr. Scorza, money for the needs of the children. Ms. Fletcher bought clothing, toys and gifts for [J.] for birthdays, Christmas and on other occasions. There is no court order for the support of [J.] between Angie Fletcher and Kevin Scorza. There is no proof that Ms. Fletcher provided any support for [J.] to Mr. Scorza on a regular basis. Mr. Scorza has provided the majority of support for [J.] from August 2005 to date. Ms. Fletcher has provided no support to Kevin Scorza for [J.] since the temporary hearing in this matter on January 10, 2008.

9. Kevin Scorza initiated action in September 2007 to terminate his child support obligation owed to Angie Fletcher. Child support payments from Mr. Scorza to Ms. Fletcher were terminated in December 2007. Two weeks after the child support payments were terminated, Ms. Fletcher came to Arkansas and picked up all three children.

10. Kevin Scorza is qualified and suitable to serve as [J.]'s guardian pursuant to Ark.Code Annot. § 28–65–210. Angie Fletcher delegated her parental responsibilities to Kevin Scorza for the care, custody and control of [J.F.] from August 2005 until December 2007.

11. While Ark.Code Annot. § 28–65–210(a) grants preferential status to the parents of a child, this preference is only one factor that the court must consider in determining who will be the most suitable guardian for the child. Any inclination to appoint a parent must be subservient to the principal that the child's best interest is of paramount consideration. *Freeman v. Ruston* [*Rushton*], 360 Ark. 445, 202 S.W.3d 485 (2005). The child's best interest is of paramount consideration, both in custody and in guardianship situations. *Freeman, supra.*

. . . .

15. In *Standridge v. Standridge,* 304 Ark. 364, 803 S.W.2d 496 (1991), the Arkansas Supreme Court cited Black's Law Dictionary (5th ed.1979) defining *"in loco parentis"* as "in place of a parent; instead of a parent; charged factitiously with a parent's rights, duties and responsibilities."

16. The key issue before the Court and the Court's primary concern in this case is [J.]'s best interest.

17. Although the parties initially thought the arrangement would last for only a few days or weeks, this arrangement has lasted now for well over two years. Kevin Scorza has adequately provided for the needs of [J.] since August 2005.

18. Mr. Scorza, his mother, Barbara Scorza, Mr. Scorza's 85 year old grandmother and the two Scorza children have been the family [J.] has known and loved for the last two years. Separating [J.] from this family environment and his two half siblings is not in [J.]'s best interest.

19. Ms. Fletcher is not suitable to serve as the parent having custody of [J.]. She has made a conscious decision to delegate her parental responsibilities, duties and obligations to Kevin Scorza. When Mr. Scorza took steps to and finally did stop paying child support for the children, only then did Angie Fletcher seek to regain custody of her son, [J.]. The timing of the termination of child support and the taking of [J.] from the family and the home he had known for the last two plus years, cannot be overlooked by this Court.

20. Angie Fletcher has not demonstrated, even by a preponderance of the evidence, that she has contributed significantly to the financial support of [J.] since he has been in Kevin Scorza's custody. Although Ms. Fletcher purchased clothing and gifts and she did provide money for these items, at Christmas and on other occasions when Mr. Scorza made requests of her for financial assistance, testimony before this Court reveals that she did so with money provided her by Mr. Scorza in the form of child support he was paying to her for the two children who were actually in his care. There is no proof that Ms. Fletcher contributed to the support of [J.] with any funds of her own. Every parent has a moral and legal obligation to support a child, even absent a court order to do so.

21. A fit parent would not delegate her parental responsibility to someone only so long as it benefitted her financially. A fit parent would not seek to regain custody of the child only when the financial benefit terminated, all to the detriment of the child. Angie Fletcher is neither fit nor suitable to serve as [J.]'s guardian or custodial parent.

22. A guardianship is necessary to protect the health, safety and welfare of [J.F.].

Specifically noting that it was in the best interest of J.F., the circuit court granted Mr. Scorza's petition for guardianship. Ms. Fletcher now appeals.

Ms. Fletcher argues that the circuit court erroneously entered the order of guardianship without sufficient evidence that she, the natural parent, was unfit or that the guardianship was necessary. She states that she in no way abandoned J.F., as she fully intended to retrieve her children once she reestablished her life in New Orleans. She disputes the circuit court's finding that she could have retrieved her children as early as the end of 2005, stating that the city was not a suitable place for children to live at that time. She further disputes the circuit court's findings that she was not suitable to serve as a parent because she delegated her parental duties to Mr. Scorza and that she was unfit because she did not contribute financially.

Mr. Scorza responds that significant evidence was presented to the circuit court that Ms. Fletcher delegated her parental duties to Mr. Scorza. He further states that no evidence was presented to support a finding that Ms. Fletcher contributed significantly to the financial support of J.F. from August 2005 until December 2007. He maintains that, after considering the presumptions and protections afforded parents, the circuit court correctly found that any presumption that Ms. Fletcher was the preferred guardian was rebutted by her failure to discharge her parental

duties. Finally, he asserts the circuit court correctly found that it was in J.F.'s best interest that Mr. Scorza be appointed his guardian.

 This court reviews probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *See Devine v. Martens*, 371 Ark. 60, 263 S.W.3d 515 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *See id.* When reviewing the proceedings, we give due regard to the opportunity and superior position of the probate judge to determine the credibility of the witnesses. *See id.*

 |₁₁Arkansas Code Annotated § 28–65–210 (Repl.2004) provides:

Before appointing a guardian, the court must be satisfied that:

(1) The person for whom a guardian is prayed is either a minor or otherwise incapacitated;

(2) A guardianship is desirable to protect the interests of the incapacitated person; and

(3) The person to be appointed guardian is qualified and suitable to act as such.

Where the incapacitated person is a minor, the key factor in determining guardianship is the best interest of the child. *See Blunt v. Cartwright*, 342 Ark. 662, 30 S.W.3d 737 (2000). Preferential status in a guardianship proceeding may be given to the natural parents of a child pursuant to Ark.Code Ann. § 28–65–204(a) (Repl.2004). *See id.* That section provides that "[t]he parents of an unmarried minor, or either of them, if qualified and, in the opinion of the court, suitable, shall be preferred over all others for appointment as guardian of the person." Ark.Code Ann. § 28–65–204(a). A

plain reading of that section demonstrates that only a natural parent who is both qualified and, in the opinion of the circuit court, suitable, shall be preferred over all others to be the child's guardian; however, the natural-parent preference does not automatically attach to a child's natural parents. *See Blunt, supra.*

 It is within the circuit court's discretion to make a determination as to whether a parent is qualified and suitable. *See Freeman v. Rushton*, 360 Ark. 445, 202 S.W.3d 485 (2005). Moreover, the natural-parent preference is but one factor that the circuit court must consider in determining who will be the most suitable guardian for the child. *See Blunt, supra.* Any inclination to appoint a parent or relative must be subservient to the principle that the child's interest is of paramount consideration. *See Blunt, supra.*

|₁₂As an initial matter, we note that Ms. Fletcher's arguments are premised in part on the idea that a natural parent must be proven unfit before a guardianship may be entered in favor of someone other than the natural parent. Indeed, this court has previously observed, in the context of a guardianship case, that "[t]he law prefers a parent over a grandparent or other third person unless the parent is proved to be incompetent or unfit." *Devine*, 371 Ark. at 71, 263 S.W.3d at 523 (citing custody cases). And in this case, the circuit court found Ms. Fletcher neither fit nor suitable to serve as guardian of J.F.

 However, as already noted, section 28–65–204(a) provides a natural-parent preference if the natural parent is qualified, and in the opinion of the court, suitable. The statute makes no mention of whether the natural parent is "fit" or "unfit," as those terms have been used in custody cases. Moreover, we have previously attempted to distinguish guardianship cases from custody cases:

The natural-parent preference referred to by appellant derives from our long-established caselaw in custody matters and from Ark.Code Ann. § 28–65–204(a). *While the two preferences are similar, the preference at issue here is the statutory preference, Ark.Code Ann. § 28–65–204(a).* *Freeman,* 360 Ark. at 449, 202 S.W.3d at 487 (emphasis added). In *Freeman,* we rejected Freeman's argument that "the natural-parent preference must prevail unless it is established that the natural parent is unfit," observing that "[*Stamps v. Rawlins,* 297 Ark. 370, 761 S.W.2d 933 (1988), relied on by Freeman,] is a modification-of-custody case, not a guardianship case, governed by the case-law preference, not the statutory preference found in Ark. Code Ann. § 28–65–204(a)." *Id.* at 451–52, 202 S.W.3d at 488. We, therefore, take this opportunity to [13]clarify that the sole considerations in determining guardianship pursuant to Ark.Code Ann. § 28–65–204(a) are whether the natural parent is qualified and suitable and what is in the child's best interest. To the extent that any of our prior cases suggest a standard of fitness or unfitness in guardianship proceedings involving the statutory natural-parent preference, we overrule them.

We turn, then, to the merits of the instant case. In order for Ms. Fletcher, as a natural parent, to be preferred over all others for appointment as guardian of J.F., section 28–65–204(a) required that she be qualified, and, in the judge's opinion, suitable. In addition, J.F.'s best interest was to be considered. Here, the circuit court found that, not only was Ms. Fletcher not suitable, but it was also not in J.F.'s best interest that she be appointed guardian.

Specifically, the circuit court found that: (1) Mr. Scorza, his mother, his grandmother, and his other two children were the "family [J.F.] has known and loved for the last two years;" (2) separating J.F. from that family environment and his half-siblings was not in his best interest; (3) Ms. Fletcher made a conscious decision to delegate her parental responsibilities, duties, and obligations to Mr. Scorza; (4) Ms. Fletcher only sought to retrieve J.F. after Mr. Scorza stopped paying child support; (5) Ms. Fletcher had not contributed significantly to J.F.'s financial support since he had been with Mr. Scorza; (6) while Ms. Fletcher purchased clothing and gifts and provided money when requested to do so by Mr. Scorza, she did so with the child-support funds paid to her by Mr. Scorza for the two children actually in his [14]care; and (7) Ms. Fletcher was neither fit, nor suitable to serve as J.F.'s guardian.[2]

Based upon the evidence before it, the circuit court found that Ms. Fletcher was not suitable and that it was in J.F.'s best interest for Mr. Scorza to be appointed guardian. After taking into account all of the testimony presented and the circuit court's superior position to weigh and assess the credibility of witnesses and their testimony, we are not left with a definite and firm conviction that a mistake was made by the circuit court. Again, in guardianship matters, the natural-parent preference is but one consideration, which is subservient to the principle that the child's best interest is the paramount consideration. In light of our standard of review, we affirm the circuit court's order.

Affirmed; court of appeals reversed.

CORBIN, WILLS, and SHEFFIELD, JJ., dissent.

2. While the circuit court found Ms. Fletcher unfit, which we today acknowledge is not the requisite consideration under the statute, we need not remand this matter because it is clear that the circuit court also found Ms. Fletcher unsuitable, which was the requisite determination under Ark.Code Ann. § 28–65–204(a).

WILLS, J., dissenting.

Because I am left with a definite and firm conviction that a mistake has been made, I must respectfully dissent.

My disagreement with the majority opinion stems mainly from its conclusion that the trial court's findings were not clearly erroneous. I also disagree, however, with two recitations of law relied upon by the majority: 1) that the statutory preference in favor of a parent is but "one factor" to consider in guardianship cases; and 2) that "any inclination to appoint a parent ... [as guardian] must be subservient to the principle that the child's best interest is of paramount consideration." For each of these propositions, the majority cites *Blunt v. Cartwright*, 342 Ark. 662, 30 S.W.3d 737 (2000). In *Blunt*, the natural mother of the child in question was killed and the putative father was appointed as temporary guardian. The maternal grandparents petitioned to be permanent guardians, and their request was granted by the trial court. The father appealed. This court affirmed that conclusion, stating as follows:

> Where the incapacitated person is a minor, the key factor in determining guardianship is the best interest of the child. *Bennett v. McGough*, 281 Ark. 414, 664 S.W.2d 476 (1984); *Trammell v. Isom*, 25 Ark.App. 76, 753 S.W.2d 281 (1988); *Marsh v. Hoff*, 15 Ark.App. 272, 692 S.W.2d 270 (1985); *Monroe v. Dallas*, 6 Ark.App. 10, 636 S.W.2d 881 (1982). Preferential status may be given to the natural parents of the child under Ark.Code Ann. Sec. 28–65–204 (Supp.1999). This preference, however, is but one factor that the probate court must consider in determining who will be the most suitable guardian for the child. *See Marsh*, 15 Ark.App. 272, 692 S.W.2d 270. Indeed, any inclination to appoint a parent or relative must be

subservient to the principle that the child's best interest is of paramount consideration. *See Bennett*, 281 Ark. 414, 664 S.W.2d 476.

*Blunt*, 342 Ark. at 669, 30 S.W.3d at 741.

In the last two sentences above, the *Blunt* case relies on *Marsh v. Hoff*, 15 Ark.App. 272, 692 S.W.2d 270 (1985), and *Bennett v. McGough*, 281 Ark. 414, 664 S.W.2d 476 (1984), the former for the proposition that the statutory preference is "one factor" to consider, and the latter for the proposition that any inclination to appoint a parent must be subservient to the child's best interests. In my view, the *Marsh* case is flawed and the *Bennett* case is inapposite, and thus, *Blunt*'s reliance upon them wrong, as is our reliance on *Blunt*.

In *Marsh v. Hoff, supra*, the natural mother of a minor child died, and the child's half brother and his wife petitioned for guardianship. They were appointed temporary guardians, but the trial judge later denied them permanent guardianship and placed the child with the natural father. The court of appeals reversed this finding, concluding that the trial court abused its discretion in light of the testimony concerning the filthy living conditions at the natural father's house and the absence of hot water or sufficient food for the child. In reaching its conclusion, the court of appeals stated that "[t]he parental preference provided for in Ark. Stat. Ann. section 57–608 [the precursor to Ark.Code Ann. § 28–65–204] is only one of the factors to be considered by the court in determining who would be the most suitable guardian." The court of appeals cited *Monroe v. Dallas*, 6 Ark.App. 10, 636 S.W.2d 881 (1982), for this proposition. This statement, as well as the reliance on *Monroe v. Dallas* for it, is erroneous.

*Monroe, supra*, did not involve the statutory preference in favor of a natural par-

ent. In *Monroe*, the father of the child in question shot and killed the child's mother. The father was convicted of manslaughter and was serving a twenty-year prison sentence. The maternal grandfather filed a petition to be the child's guardian. The father objected and *stated his preference for his brother to be the child's guardian.* The trial court appointed the grandfather, and the brother and the father appealed, arguing that the trial court erred in appointing the grandfather rather than the brother, whom the father preferred. The court of appeals ₁₇affirmed. It first set out the pertinent portions of the applicable statute (now Arkansas Code Annotated section 28–65–204), which provided that

> [t]he parents of an unmarried minor, or either of them, if qualified and in the opinion of the court suitable, shall be preferred over all others for appointment as guardian of the person. Subject to this rule, the court shall appoint as guardian of an incompetent the one most suitable to serve, *having due regard to: (a) any request contained in a will or other written instrument executed by the parent for the appointment of a person as guardian of his minor child; ... (d) the relationship by blood or marriage to the person for whom the guardianship is sought.*

*Monroe*, 6 Ark.App. at 11, 636 S.W.2d at 883 (emphasis added).

In *Monroe*, the court of appeals stated that "A reading of this statute indicates that *parental preference is only one of the many factors to be considered in deter-*

*mining the one most suitable to serve as guardian." Id.* at 11–12, 636 S.W.2d at 883 (emphasis added). The court of appeals also stated that "[t]he Supreme Court has stated that the statute does not make an ironclad order of priority; instead, it leaves to the probate court's sound discretion the appointment of a guardian who would forward the best interests of the ward. *McCartney v. Merchants and Planters Bank,* 227 Ark. 80, 296 S.W.2d 407 (1956)." *Id.* at 12, 636 S.W.2d at 883.

It is obvious that the Court of Appeals in *Monroe* was not discussing the preference for appointing a natural parent as guardian that is found at Arkansas Code Annotated section 28–65–204(a). No natural parent was seeking guardianship in *Monroe*. The court was instead addressing the natural parent's preference as to the *choice* of the child's guardian under what is now section 28–65–204(b)(1) and (b)(4), when neither natural parent was available to be the guardian. In that circumstance, the preference of the parent as to who should be ₁₈appointed is "but one factor" to consider.

The court of appeals in *Marsh v. Hoff, supra,* erroneously cited *Monroe* and applied it to a case in which the natural-parent preference under section 28–65–204(a) *was* at issue. We repeated the error by relying on *Marsh* in *Blunt v. Cartwright, supra,* and the majority repeats the error here by now relying on *Blunt.*[3]

---

**3.** We also recited this "one factor" language of *Blunt* in *Freeman v. Rushton,* 360 Ark. 445, 202 S.W.3d 485 (2005), wherein we concluded that the statutory preference was just that, a preference, and "[that] preference and the fitness of that parent are not the absolute determinants in custody modification matters...." We repeated this same "one factor" language in *Devine v. Martens,* 371 Ark. 60,

263 S.W.3d 515 (2007), but also cited case law to the effect that the law prefers a parent over a grandparent or other third person unless the parent is proved to be incompetent or unfit. *Id.* at 71, 263 S.W.3d at 523. *See also Smith v. Thomas,* 373 Ark. 427, 284 S.W.3d 476 (2008) (repeating the "one factor" language).

In my view, the statutory preference for the natural parent to be appointed as guardian is more than "one factor" to consider. The statute dictates that "the parents of an unmarried minor, or either of them, if qualified and, in the opinion of the court, suitable, *shall be preferred over all others* for appointment as guardian of the person." (emphasis added). The statute does not set out this preference as "one factor" to be considered. It is more than that, although certainly it is not a mandate to appoint the natural parent, if suitable. *See Freeman v. Rushton, supra.*

Similarly, the *Blunt* court's reliance on *Bennett v. McGough, supra,* for the proposition that "any inclination to appoint a parent or relative must be subservient to the principle that the child's best interest is of paramount consideration" is misplaced. Again, as with *Monroe, Bennett* did not involve the natural-parent preference of section 28–65–204(a). In *Bennett,* both parents were killed in an accident. Friends of the family were appointed as guardians of the minor children. The maternal grandparents objected and argued that they should be appointed. The trial court appointed the friends of the family, concluding that neither party had a statutory preference. This court affirmed, concluding that the applicable statute (now Ark.Code Ann. § 28–65–204), "is couched in such terms as to allow the court to exercise its sound discretion and *only grants a preference to the parents of a minor.* Any inclination to appoint *a relative* must necessarily become subservient to the principle that the child's best interest is of paramount consideration." *Bennett,* 281 Ark. at 416, 664 S.W.2d at 477–78 (emphasis added). One justice dissented, stating that the effect of the court's ruling was to "ignore all of the statute except the first sentence," meaning the natural-parent preference of section 28–65–204(a).

*Id.* at 418, 664 S.W.2d at 478–79 (Purtle, J., dissenting).

In *Blunt, supra,* the language used in *Bennett* regarding the appointment of relatives was extended to include the appointment of natural parents: "any inclination to appoint *a parent* or relative must be subservient [to the] child's best interest. . . ." *Blunt,* 342 Ark. at 669, 30 S.W.3d at 741 (emphasis added). In my view, this is an unwarranted extension of the *Bennett* holding. Of course, the best interests of the child should be foremost in the mind of the circuit court in guardianship cases. The General Assembly has made a policy determination, however, that the natural parent, if suitable, should be preferred. Although this preference is not an inexorable command, in my view it deserves more consideration than accorded by our faulty reliance on the cases cited above.

The circuit court in the case at bar expressly relied upon the proposition that the natural-parent preference is "subservient" to the bests interest of the child, as well as the conclusion that the natural-parent preference is "but one factor," in reaching its conclusions. This brings me to my primary disagreement with the majority opinion: its upholding of the trial court's finding that the mother in this case, Fletcher, was unsuitable. The circuit court's primary rationale for this conclusion appears to be that Ms. Fletcher "made a conscious decision to delegate her parental responsibilities, duties, and obligations to Kevin Scorza." The circuit court also found that only when Mr. Scorza stopped paying child support for the other children did Ms. Fletcher seek to regain custody of the minor, J.F. The court also concluded that Ms. Fletcher had not demonstrated that she contributed significantly to the financial support of J.F. during his time in Mr. Scorza's custody. These findings led the court to conclude that "a fit

parent would not delegate her parental responsibility to someone only so long as it benefitted her financially." The court also noted that "separating J.F. from this family environment and his two half siblings is not in [his] best interests."

I agree with the court of appeals' conclusions reversing the circuit court:

> Given the circumstances prevailing in New Orleans and appellant's lack of housing, appellant exercised wise judgment by permitting J.F. to remain with appellee. It would appear that the trial court questioned appellant's judgment for allowing J.F. to stay with appellee past the time when the court surmised that the situation in New Orleans had stabilized. However, during this time, appellant was making efforts to improve the quality of her life, and thus J.F.'s, by obtaining her degree in nursing. While the parties' agreement placed J.F. in appellee's temporary care, the evidence shows that appellant was not wholly derelict in her duties as a parent. Although appellant paid no support per se, it is undisputed that she sent gifts and provided money, clothing, and other necessities during this period of separation. Appellant also maintained consistent contact with J.F. by phone and visited with him on a number of occasions. Moreover, the trial court's finding that appellant's resumption of custody coincided with the cessation of child support is not justified by the record. The evidence shows that appellant stopped receiving appellee's child-support payments in August 2007, and not in December 2007 when she reclaimed the child. Instead, appellant's resumption of custody coincided with her graduation from nursing school.

*Fletcher v. Scorza,* 2009 Ark.App. 372, at 8–9, 2009 WL 1232100.

In April of 2006, during or shortly after the time during which Ms. Fletcher was living on a cruise liner with other law enforcement and emergency personnel after the hurricane, she had to make a decision whether to stay in New Orleans or leave. As a lifelong resident of New Orleans, having just been accepted into nursing school, and with no other home to go to, she elected to stay. With the New Orleans school system still in disarray, she left her children, including J.F., in the care of the only father they had ever known, Mr. Scorza, until she completed nursing school and the situation in New Orleans stabilized. For this, and the reasons set out above, the trial court found her unfit and unsuitable.

We recently reversed a trial court for a similar finding, in a case without anywhere near the exigent circumstances in this case—that is, Hurricane Katrina—even though there were multiple issues as to the mother's home environment and judgment. *Devine v. Martens,* 371 Ark. 60, 263 S.W.3d 515 (2007) (reversing circuit court's finding of unfitness and abandonment where mother left child with grandparents for various periods of time, including for seven months to relocate to New York). We stated that it was clear the trial court improperly based its judgment on its own morals and viewpoint, *id.* at 73 n. 5, 263 S.W.3d at 525 n. 5, and concluded that, "[f]rankly, it is not in a child's best interest to take custody from a natural parent who has rectified all issues related to his or her fitness and grant custody to a third party." *Id.* at 74, 263 S.W.3d at 526.

We should rule the same way in this case, particularly where Ms. Fletcher, in my view, has no issues to rectify. I would further add that it is not clear to me from the record that appointment of Ms. Fletcher as guardian would have the effect of "separating J.F. from … his two half

siblings," as the circuit court stated. The record reflects that Ms. Fletcher has legal custody of the half siblings as well as J.F.

In conclusion, I simply cannot fathom how the actions of this mother render her "unsuitable," and thus am left with a definite and firm conviction that a mistake has been made. Hurricane Katrina tragically, but temporarily, separated this mother and son. This court should not compound the tragedy by making the separation permanent. Like the court of appeals, I would reverse the circuit court's conclusions as clearly erroneous. I therefore respectfully dissent.

CORBIN and SHEFFIELD, JJ., join this dissent.