

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–13–365

| | |
|---|---|
| | **Opinion Delivered** DECEMBER 18, 2013 |
| SARAH WILSON | |
| APPELLANT | APPEAL FROM THE OUACHITA COUNTY CIRCUIT COURT [NO. PR–12–125–3] |
| V. | |
| | HONORABLE EDWIN KEATON, JUDGE |
| RANDY WILSON and DONNA WILSON | |
| APPELLEES | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Sarah Wilson appeals the entry of an order awarding permanent guardianship of her daughter EJW (born in November 2011) to appellees Randy and Donna Wilson, the child's paternal grandfather and stepgrandmother (hereinafter "Randy" or "the grandparents"). EJW's biological father, Billy Wilson, did not contest the guardianship and does not appeal. Billy is Randy's son and Sarah's husband. Sarah contends on appeal that the Ouachita County Circuit Court clearly erred in finding that EJW needed permanent guardianship or that it was in her best interest to be placed with the grandparents. The grandparents assert that the trial court's order is not clearly erroneous as it is supported by the evidence and compatible with Arkansas law. We affirm.

Our appellate courts review guardianship proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Witham v. Beck*, 2013 Ark.

App. 351, ___ S.W.3d ___. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a distinct and firm impression that a mistake has been made. *Id.* When reviewing the proceedings, we give due regard to the opportunity and superior position of the trial court to determine the credibility of the witnesses. *Id.* Moreover, in cases involving children, we afford even more deference to the trial court's findings because our appellate courts have made clear that there is no other case in which the superior position, ability, and opportunity of the trial judge to observe the parties carries a greater weight than one involving the custody of a child. *Id.*

EJW, only one year old at the time the permanent guardianship was ordered, falls under the definition of an incapacitated person because she is under the age of majority. Ark. Code Ann. § 28-65-104(1) (Repl. 2012). The purpose of guardianship over an incapacitated person is set forth in Ark. Code Ann. § 28-65-105 (Repl. 2012). As relevant here, guardianship is to be used "only as is necessary to promote and protect the well-being of the person and his or her property." *Id.* at subsection (1). Arkansas Code Annotated section 28-65-210 (Repl. 2012) provides what must be proved to the trial court in order to appoint a guardian: (1) the person is a minor or is otherwise incapacitated, (2) a guardianship is desirable to protect the interests of the incapacitated person, and (3) the person to be appointed guardian is qualified and suitable to act as such. There is a statutory preference to be given to the parent, "if qualified and, in the opinion of the court, suitable" to be appointed guardian, as set out in Ark. Code Ann. § 28-65-204(a). This natural-parent preference does not automatically attach to a child's natural parents; it is within the circuit court's discretion

2

SLIP OPINION

to make a determination as to whether a parent is "qualified" and "suitable" under section 28–65-204(a). *Fletcher v. Scorza*, 2010 Ark. 64, 359 S.W.3d 413.

When the incapacitated person is a minor, the key factor in determining guardianship is the best interest of the child. A determination of parental fitness is not necessary in guardianship proceedings as between a natural parent and a third party; the best interest of the child is paramount. *Id*. To the extent that any prior cases suggest a standard of fitness or unfitness in guardianship proceedings involving the statutory natural-parent preference, those cases were overruled in *Fletcher*. The natural-parent preference is but one factor that the circuit court must consider in determining who will be the most suitable guardian for the child. *Id*. Any inclination to appoint a parent or relative must be subservient to the principle that the child's interest is of paramount consideration. *Id*.

With this framework, we examine the evidence presented to the trial court. These family members resided in Camden, Arkansas. Sarah has two sons, SC and CM, and a daughter, EJW. Sarah's children were fathered by three different men. Sarah is in her early twenties. Sarah's husband, Billy, also in his early twenties, is the biological father of EJW and stepfather to the boys. By all accounts, Billy has a violent streak, a criminal record, and problems with drug addiction. Billy was physically abusive to Sarah on more than one occasion. By way of example, Sarah said that Billy threw a television at her while she was holding EJW in her arms. Sarah developed a pattern of reporting Billy's abusive behavior to law enforcement and seeking orders of protection, only to later drop the charges and resume her relationship with him. Billy was in and out of jail. He did not participate in any of the

guardianship proceedings other than to consent to the grandparents being appointed guardians of EJW.

In late September 2012, Sarah left ten-month-old EJW with the grandparents and checked herself into Bridgeway Hospital for what she described as stress and anxiety. Sarah was diagnosed with a borderline-personality disorder. Sarah left Bridgeway after a week, saw her children for one day, and then she left them to go to Conway for a few days to visit a woman named Brandi Richardson, whom she met at Bridgeway Hospital.

In early October 2012, the paternal grandparents petitioned for guardianship over EJW.[1] The grandparents were concerned over Sarah's living arrangements—she and her children were living with Sarah's mother, sisters, and grandmother in Sarah's grandmother's mobile home, which was in deplorable condition. The paternal grandparents also had grave concerns about the chaotic life that accompanied Sarah's marriage to Billy, her refusal to cut ties with him, and her general instability and lack of income. The trial judge took testimony, including that from Sarah despite her hours-late arrival to the hearing, where she appeared pro se.

Sarah explained that she went to Conway to see her friend Brandi and to attend a support group for people with emotional problems. She said that she became aware that the grandparents were trying to establish a guardianship over her daughter when she returned to Camden. Sarah agreed that Billy was abusive but stated that she was ready to get a divorce.

---

[1]Sarah limited the record on appeal and did not include the original petition for temporary and permanent guardianship filed by the grandparents.

4

Sarah agreed that the grandparents had kept EJW almost every weekend, but that was because they asked to have her. She also stated that there had been a lot of cleaning effort at her grandmother's residence.

Randy testified that he and his wife had EJW practically every weekend, and that over time, they worried about EJW having so many mosquito bites, severe diaper rash, knots on her head, and bruising. He said that EJW's condition would improve over the weekend, but that by the following Friday, "it would start all over." Randy expressed worry over the uncleanliness of Sarah's living situation, stating that there were animal feces and odor associated with Sarah's mother's home. Randy stated his concerns about his son Billy and his desire to give EJW safety and stability while Sarah and Billy resolved their domestic problems in some fashion.

The trial court entered a temporary order appointing the grandparents as EJW's guardians and ordering that Sarah and Billy be permitted reasonable visitation at the discretion of, and supervised by, the grandparents. This order was filed on October 12, 2012.

Shortly after that hearing, Sarah packed up her belongings and moved to northwest Arkansas, where a male friend of hers lived. This male friend, Scott Parker, happened to be in Bridgeway at the same time she was. She signed a lease for an apartment in Fort Smith, but she changed her mind within days and came back to Camden to live with her mother.

Sarah filed a formal response in opposition to temporary and permanent guardianship on November 12, 2012, after she had hired an attorney to represent her. Sarah contended,

SLIP OPINION



in part, that EJW received WIC benefits and Medicaid coverage, and that guardianship over EJW should be terminated.

The final hearing was conducted over two days, December 27 and 28, 2012. Sarah testified that she earned her room and board by living with and taking care of her grandmother; that her mother paid any extra bills; that she earned $70 one time for cleaning an elderly man's house; and that she received occasional child support for her oldest son. Sarah contended that her grandmother's home had been substantially cleaned and repaired, offering photographs to prove it. Sarah explained her use of prescription medications, including long-standing prescriptions for narcotic pain medication to treat arthritis and endometriosis. She had been permitted limited, supervised visitation with EJW, but she believed that Randy and his wife Donna were trying to take EJW away without a good reason. Sarah asserted that her three children deserved to be together, with her.

Sarah's mother testified that she paid Sarah's bills in exchange for Sarah taking care of her mother (Sarah's grandmother). Sarah's mother said that Sarah received food stamps for herself and her two young sons. Various friends and co-workers of Sarah's mother, as well as Sarah's pastor, testified to their observations in public of Sarah being a good mother.

The paternal grandparents testified to having a strong bond with EJW, having had her most weekends leading up to their original petition for guardianship. The grandparents stated that they were financially and emotionally capable of providing a safe, secure home for EJW, and that they only wanted to provide for EJW's safety and well being when it was jeopardized by both Sarah and Billy.

After hearing testimony and taking evidence, the trial judge took the matter under advisement. A four-page letter opinion followed on December 31, 2012, which was incorporated into the guardianship order on appeal. The letter recited the relationship of the parties and the grandparents' desire to be appointed guardian of EJW. The letter opinion recited the trial court's understanding that in guardianship proceedings, there is a statutory parental preference, but that this preference is not absolute but rather subservient to the best interest of the child. The trial court found the grandparents suitable and qualified to be guardians, but stated its obligation to consider the parents' suitability to serve as guardians.

Billy had earlier consented to the grandparents being guardians. Nonetheless, the trial court's letter opinion noted Billy's history of domestic violence, his current incarceration, and his drug problem as reasons that Billy was unsuitable to care for EJW or any other child.

The letter opinion recounted Sarah's circumstances and the testimony of witnesses she brought on her behalf, who recounted observations of her behaving as a suitable parent. The letter opinion then set forth the following findings and conclusions regarding Sarah:

> Despite what these witnesses have seen publicly, respondent's life away from the public eye has been quite chaotic. Respondent has subjected her children to several and repeated acts of domestic violence over the last year and a half. . . . SarahWilson testifies that it was a mistake to go back to Billy Wilson, and that now he is not allowed near her boys or anywhere near her grandmother's property. . . . Respondent Sarah Wilson lacks credibility on this point, and the Court does not believe that she has ended her relationship with Billy Wilson. . . . From the evidence, the Court finds and concludes that it is in the best interest of [EJW], that a guardianship of the person be granted in favor of [the grandparents].

A formal order was filed of record on January 2, 2013, permitting Sarah and Billy reasonable visitation with EJW at the discretion of and under the supervision of the grandparents. Sarah filed a notice of appeal from this order.

Sarah appeals, arguing two points for reversal: (1) that permanent guardianship should not have been ordered where the reasons that supported temporary guardianship were resolved; and (2) that it was not in EJW's best interest to be placed with anyone other than Sarah, her biological mother. Sarah has failed to demonstrate clear error in the findings of the circuit court.

Sarah asserts in her appellate brief that the circuit court failed to give any consideration to the natural-parent preference in the guardianship statutes and case law. We disagree. The trial court's letter opinion, which was incorporated into the order on appeal, specifically addresses the suitability of the natural parents to be guardians over EJW. Sarah also asserts that the reasons that supported a temporary guardianship were no longer in existence at the time of the permanent guardianship. Sarah admits, though, that one problem that "arguably still existed . . . involved the less than appropriate relationship" of Sarah with Billy. This was the primary problem that was an impediment to Sarah being considered a qualified and suitable guardian for EJW, and it supports the trial court's decision.

Sarah's secondary point on appeal contends that it was not in EJW's best interest for the grandparents to be named guardians because it results in a separation of EJW from her two half-siblings. We note that the hesitation to separate siblings is not applied with equal force when the relationship is among half-siblings. *Donato v. Walker*, 2010 Ark. App. 566, 377

S.W.3d 437. Trial courts are not always able to provide flawless solutions to unsolvable problems, especially where there are only limited options available. *Id.* Here, the trial judge was faced with a decision focused on EJW's best interest, and we cannot conclude on de novo review of this record that his decision was clearly erroneous. Sarah asserts also that the trial court's letter opinion did not set forth the words, "best interest" or delineate the relevant factors bearing on EJW's best interest. To the contrary, a trial court's order need not contain "magic words" if it is obvious that the trial court considered the child's best interest. *Baber v. Baber*, 2011 Ark. 40, 378 S.W.3d 699.

Sarah raises additional arguments surrounding a parent's fundamental due-process right to raise her child, implicating constitutional concerns. However, those arguments are raised for the first time on appeal and are, therefore, not preserved for our review. *TEMCO Const., LLC v. Gann*, 2013 Ark. 202, ___ S.W.3d ___; *Smith v. Thomas*, 373 Ark. 427, 284 S.W.3d 476 (2008).

We hold that the trial court applied Arkansas case law and statutes correctly in this instance, and we affirm its findings of fact as not clearly erroneous.

Affirmed.

WYNNE and BROWN, JJ., agree.

*Mary Thomason*, for appellant.

*Harrell, Lindsey & Carr, P.A.*, by: *Christina S. Carr*, for appellees.