
# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-16-29

ARDITH LARAY MOSSHOLDER

APPELLANT

V.

DANIEL COKER, MARTHA COKER,
AND MINOR CHILDREN

APPELLEES

**Opinion Delivered** May 3, 2017

APPEAL FROM THE FAULKNER
COUNTY CIRCUIT COURT
[NO. 23DR-07-57]

HONORABLE H.G. FOSTER,
JUDGE

AFFIRMED

## LARRY D. VAUGHT, Judge

Appellant Ardith Laray Mossholder ("Laray") appeals the July 7, 2015 order entered by the Faulkner County Circuit Court awarding appellee Martha Coker permanent guardianship of Laray's children, H.C. (born July 7, 2004), and D.C. (born August 13, 2005). On appeal, Laray argues that the circuit court erred in awarding guardianship to Martha because she did not properly intervene; she was an unsuitable guardian; and she failed to prove that Laray was unfit. We affirm.

This case has a long history.[1] Laray and appellee Daniel Coker (Martha's son) were married on August 18, 2003. H.C. and D.C. were born of the marriage. Laray and Daniel

---

[1] On the topic of length, we note that Laray's abstract (1500 pages) and addendum (1208 pages) include far more material than is necessary for our review of the issues on appeal. Both the abstract and addendum include irrelevant information regarding matters of contempt, attorney's fees, service, withdrawal and substitution of counsel, continuances, subpoenas, etc. Our rule on abstracting provides that the abstract should be limited to the "material parts" of all the transcripts. Ark. Sup. Ct. R. 4-2(a)(5) (2016). Likewise, the contents of the addendum are to be limited to only those items necessary to an understanding of the issues on appeal or

separated on or about July 1, 2006, and Daniel filed for divorce on January 7, 2007. A divorce

decree with an integrated property settlement was entered on February 20, 2008, wherein,

among other things, Daniel was granted a divorce, and the parties were awarded joint legal

and physical custody of the children.

Daniel married Kathleen Coker ("Kathy") in August 2008. Laray married Joshua

Mossholder in 2008.[2]

The record reflects that in March 2008, Laray began making reports to the Arkansas

Department of Human Services ("DHS") and the Faulkner County Sheriff's Office that

Daniel was sexually abusing H.C. and D.C.[3] On September 30, 2008, Daniel filed a petition

for change of custody, alleging that a material change in circumstances had occurred. He

---

our jurisdiction. Ark. Sup. Ct. R. 4-2(a)(8). We have pointed out that an abstract and addendum can be deficient for containing too much material, as well as too little. *McElroy v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 117, at 1 n.1, 432 S.W.3d 109, 111 n.1 (citations omitted). Although we decline to order rebriefing, we caution counsel against such practices in the future.

[2]The record is conflicting as to the actual date of the Mossholders' wedding. Joshua said that they were married in August 2008. Laray testified that they were married in March 2008. A summary of events prepared by an attorney ad litem provided that the Mossholders' August 2008 marriage license was signed by Laray as the minister performing the marriage but that a second Mossholder marriage license, dated November 12, 2008, was signed by the justice of the peace.

[3]From March 2008 to December 2011, Laray made at least sixteen reports of abuse to DHS. Eleven of the reports alleged that Daniel sexually/physically abused H.C. and/or D.C. One report alleged that Daniel and Kathy sexually abused H.C. and D.C. Two reports alleged that D.C. was sexually abusing H.C and/or his half-sister (Laray and Joshua's daughter). One report alleged that the children's daycare physically abused D.C. All were determined to be unfounded or unsubstantiated. During this same time frame, Laray made two separate reports to the Faulkner County Sheriff's Office that Daniel sexually abused the children. Both cases were closed based on lack of evidence.

SLIP OPINION

claimed that Laray had made "numerous complaints" that he had sexually abused H.C. and D.C. that were unfounded and were detrimental to the parties' children. Laray responded and counterclaimed for custody, claiming that the allegations of sexual abuse were true and supported by physical evidence. An attorney ad litem was appointed for the children on January 28, 2009.

Between 2009 and 2012, Laray and Daniel filed multiple motions (i.e., change of custody, modify visitation, contempt) against each other, and temporary custody of the children was transferred back and forth between them. In June 2012, an emergency hearing was held wherein the attorney ad litem reported to the circuit court that there had been numerous allegations of abuse, that she believed Laray was exacerbating the children's fear and negativity about Daniel by calling him a pedophile and a rapist, that what the children were reporting was unbelievable, that the children's counselors were not trained to determine whether the children were telling the truth, that the children had been forced to undergo multiple examinations and no physical evidence of abuse had been found, and that the parties and their children needed to be evaluated by a forensic psychologist, which had been previously ordered by the court. The ad litem stated that Daniel had submitted to the evaluation but that the psychologist could not conclude the evaluation until Laray submitted to the testing. The attorney ad litem stated that Laray would not follow court orders.

At the conclusion of the emergency hearing, the circuit court found that the children were suffering emotionally due to the "long extensive history with repeated investigations of allegations made by [Laray] . . . against the father . . . resulting in repeated interviewing, questioning and examinations of the children, that were ultimately unfounded." The court

ordered the parents and children to undergo an evaluation by forensic psychologist Dr. Paul Deyoub. The court further ordered that H.C. be placed in Daniel's temporary custody because Laray continued to make unfounded allegations of abuse against Daniel.[4] Laray was denied visitation with the children until she and the children submitted to Dr. Deyoub's evaluations.

Dr. Deyoub performed forensic psychological evaluations of the parties and their children in December 2012. In sum, Dr. Deyoub found that Daniel had no diagnoses. In great detail, he documented his evaluation of Laray and diagnosed her with cyclothymic (a mood disorder) and borderline personality disorder. He found that both H.C. and D.C. denied any sexual abuse by their father and indicated that Laray told them that their father sexually abused them. Dr. Deyoub stated that he was unable to find that Daniel abused his children and that the children "are being harmed by these constant allegations and unending examinations." Dr. Deyoub recommended that Daniel be awarded primary physical and legal custody of the children and that Laray have supervised visitation with the possibility of unsupervised visitation at a later date upon approval by the court.

A hearing was held on August 26–31, 2013, wherein twenty-four witnesses testified. The circuit court held another hearing on September 5, 2013, to announce its ruling. The circuit court noted that Martha testified that she stood ready to accept custody of H.C. and D.C. and that she orally moved to intervene in the case. The court granted her oral motion to intervene. The court found that the children had been abused; however, it stopped short of identifying who subjected the children to the abuse. The court stated that there was evidence

---

[4]At the time of this hearing, D.C. had been admitted into a long-term-care facility based on allegations made by Laray that D.C. had sexually abused his half-sister.

presented that Daniel sexually abused H.C. and D.C. and evidence that Laray abused them by manipulating and coaching the children to lie and say he did. As such, the court found that neither parent was fit to have custody and placed the children in the temporary custody of Martha. The court noted that Daniel and Kathy were living with Martha and would "be around the children a lot." The court also awarded Laray three-day-a-month visitation to be supervised by Martha.[5]

On January 21, 2014, Martha filed a petition for guardianship of H.C. and D.C.[6] A hearing on her petition was held January 21, 2015. Martha, Laray, and the children's counselor, Lena Hancock, testified. In an order filed on July 7, 2015, the circuit court found that Martha was suitable and qualified to be the permanent guardian of H.C. and D.C. and that the guardianship was in their best interest. The court therefore granted Martha's petition for guardianship.[7] The court further found that Laray was unsuitable, stating that (1) she "engaged in conduct that constitutes poisoning the minds of the children," (2) she coached the minor children to make untrue statements, and (3) the allegations of sexual abuse lodged against Daniel were unfounded. In making this finding, the court found that Laray was not a credible witness based on "days and days" of testimony. The court suspended Laray's visitation until

---

[5]In a subsequent order entered March 11, 2014, the circuit court reduced Laray's visitation to one day per month based on the recommendations of the attorney ad litem and the children's counselor, who stated that frequent visitation with Laray was detrimental to the children. In this same order, Daniel was awarded unsupervised visitation, and Laray was ordered to pay child support in the amount of $90 per week.

[6]Daniel consented to the guardianship.

[7]Letters of guardianship were entered on July 21, 2015, and Martha's acceptance of appointment of guardian was entered the same day.

such time that she received counseling for the diagnoses made by Dr. Deyoub and she petitioned the court to have visitation reinstated. Laray filed a timely appeal.

Laray's first point on appeal is that the circuit court erred in granting Martha's petition for guardianship because she did not properly intervene. Specifically, Laray contends that Martha violated Arkansas Rule of Civil Procedure 24(c) because she "has still not filed a motion to intervene."

Rule 24(c) provides that a "person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds therefore and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought." Ark. R. Civ. P. 24(c) (2016). In *Bradford v. Bradford*, 52 Ark App. 81, 88, 915 S.W.2d 723, 727 (1996), we held that although Rule 24(c) requires a party seeking intervention to state in a separate pleading the claim or defense to be advanced, when there is no surprise or substantial prejudice, the court can, and often does, treat the pleadings as amended to conform to the proof. *See also Winn v. Bonds*, 2013 Ark. App. 147, at 7–8, 426 S.W.3d 533, 537–38 (affirming the circuit court's grant of a grandparent's oral motion to intervene in a divorce action where it was clear from other written responses of the grandparent that she was seeking to intervene in the custody matter and the absence of a separate written motion to intervene did not result in surprise or prejudice to the appellant).

Martha did not file a written motion to intervene in this case. However, this does not defeat her intervention. At the August 2013 hearing, Martha testified that she was willing and able to take custody of H.C. and D.C. At the September 5, 2013 hearing, in which the circuit court announced its rulings related to the August 2013 hearing, the court stated that it recalled

that although Martha had not filed a verified petition or pleading seeking to intervene, she requested custody of the children. All counsel, including Laray's, agreed. The court again asked Martha if she was willing to take custody of the children, to which she responded yes. The circuit court then ordered that temporary custody of the children be given to Martha. No objection was made at this hearing. The November 7, 2013 order formalizing the circuit court's September 5 oral findings provided that "Martha Coker . . . testified under oath that she stands ready to take custody of the children. Based on the uncontroverted oral motion before the Court, Martha Coker is permitted to intervene in this case." Thereafter, on January 21, 2014, Martha, as an intervenor, filed a petition for guardianship, to which Laray responded. A hearing was held on Martha's petition for guardianship one year later, on January 21, 2015. Laray attended the hearing and testified.

We review a circuit court's decision permitting a party to intervene for an abuse of discretion. *Winn*, 2013 Ark. App. 147, at 6, 426 S.W.3d at 537. Here, the circuit court allowed the pleadings to conform to the proof presented at the August 2013 hearing. No objections were lodged by Laray at that time or at the September 5, 2013 hearing wherein the court confirmed that Martha had orally moved to intervene and granted the oral motion. Further, Laray fails to cite evidence of surprise or prejudice in support of her point on appeal. There is none because she responded to, and defended against, Martha's petition for guardianship. Accordingly, we hold that under the circumstances presented in this case, the circuit court did not abuse its discretion in allowing Martha to intervene.

Laray's second point on appeal is one of two challenges to the circuit court's order granting Martha's petition for guardianship. Guardianships are special proceedings that are

SLIP OPINION

governed by statute. *In re Guardianship of W.L.*, 2015 Ark. 289, at 5, 467 S.W.3d 129, 132. Arkansas Code Annotated section 28-65-210 (Repl. 2012) provides:

> Before appointing a guardian, the court must be satisfied that:
>
> (1) The person for whom a guardian is prayed is either a minor or otherwise incapacitated;
>
> (2) A guardianship is desirable to protect the interests of the incapacitated person; and
>
> (3) The person to be appointed guardian is qualified and suitable to act as such.

When the incapacitated person is a minor, the key factor in determining guardianship is the best interest of the child.[8] *Fletcher v. Scorza*, 2010 Ark. 64, at 11, 359 S.W.3d 413, 420 (citing *Blunt v. Cartwright*, 342 Ark. 662, 30 S.W.3d 737 (2000)).

We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Id.* at 10, 359 S.W.3d at 420. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.*, 359 S.W.3d at 420. In cases involving children, we afford even more deference to the circuit court's findings because our appellate courts have made it clear that there is no other case in which the superior position, ability, and opportunity of the circuit judge to observe the parties carries a greater weight than one involving the custody of a child. *Sherland v. Sherland*, 2015 Ark. App. 342, at 3, 465 S.W.3d 3, 6.

Laray's first challenge to the guardianship order is that the court erred in finding that Martha was a suitable guardian. Laray's sole argument under this point is a regurgitation of the

---

[8]On appeal, Laray does not challenge the circuit court's best-interest finding.

evidence she claims supports her persistent allegation that Daniel sexually abused H.C. and D.C.[9] She contends that Martha is an unsuitable guardian because much of the abuse occurred in her home and that she "has demonstrated that her need to protect Daniel is paramount to the safety and best interest of [H.C. and D.C.]."

Laray's argument must fail because the circuit court did not believe that Daniel sexually abused H.C. and D.C. The court stated in its order that "the allegations of sexual abuse against the father are not credible, they are not founded and that they have not been proven and shown." The court further found that Laray "has coached the minor children to make untrue statements." There was a mountain of evidence to support this finding.

There were at least twelve DHS and two Faulkner County Sheriff's Office investigations instigated by Laray wherein she alleged Daniel sexually abused the children. These were all found to be unsubstantiated. The record reflects that H.C. and D.C. denied the abuse and revealed that their mother told them to lie about it. Dr. Deyoub, who performed a forensic psychological evaluation of Laray, Daniel, and the children, concluded that Daniel did not sexually abuse the children and did not have "pedophile tendencies." Dr. Deyoub also concluded that Laray's personality test results were very elevated, which demonstrated psychopathic, paranoid, and "hypo-mania" tendencies. He diagnosed her with borderline personality disorder and opined that her test results "undermine[d] her allegations . . . almost

---

[9]For support, Laray cites the testimony of Josh Mossholder, Ronna Coker (Daniel's half-sister), Kelly Hamman (mental-health therapist), Dr. Dawn Doray (clinical psychologist), and Karen Martin (nurse practitioner)—all of whom testified at the August 2013 hearing that H.C. and D.C. told them (the witnesses) that Daniel sexually abused them (the children). She also cites the testimony of twenty-year-old Dakota Coker, Ronna's son and Daniel's nephew. Dakota testified that when he heard H.C. and D.C. say that Daniel had sexually abused them, it reminded him that Daniel had sexually abused him fifteen years ago.

completely." He found that her test results were consistent with her manipulating her children to lie about their father sexually abusing them. Dr. Deyoub further testified that the children reported to him that Daniel did not abuse them but that Laray told them to say he did. Dr. Deyoub placed no weight in the reports and testimony of the experts on which Laray relied. Dr. Deyoub stated that these experts merely treated H.C. and D.C. for abuse that did not occur; they did not perform forensic evaluations to determine whether the abuse occurred or whether the allegations were fabricated. He added that the children's false allegations of abuse against their father, along with the mental and physical examinations resulting therefrom, have been very detrimental to the children. Dr. Deyoub concluded that Daniel should have sole custody of the children and that Laray have supervised visitation.[10]

Lena Hancock, the children's therapist, testified at the guardianship hearing that the children told her that their father did not abuse them and that they felt sadness for making false statements about their father at the request of their mother. Hancock stated that there was no evidence that Daniel sexually abused the children or that D.C. sexually abused H.C. or his half-sister. She further testified that Laray manipulated and coached the children to say they had been abused by Daniel when they had not. According to Hancock, much of the treatment she provided to the children addressed their sadness and guilt about being dishonest about the abuse at the request of their mother. She added that Laray was a source of anxiety and distress for the children. Hancock further testified that the children were doing well in

---

[10]This testimony of Dr. Deyoub was elicited at the August 2013 hearing when the circuit court was making a temporary custody decision as between Laray and Daniel. Accordingly, at that hearing Dr. Deyoub was not asked his opinion about the suitability of Martha to have custody of the children. She did not file for guardianship until January 2014.

Martha's custody, that they had a very good relationship with her, and that it was in their best interest to remain in Martha's custody.

Finally, Martha testified at the guardianship hearing that she had had custody of H.C. and D.C. since the August 2013 hearing and that they had been doing well. They were happy and stable. They had good attendance and grades at school. Martha stated that she had cared for the children since they were born and that she had been a constant in their lives. She testified that she fed and clothed them. She took them to school and church. She said that she had filled the role of mother to them and that she was financially and emotionally able to care for the children.

Based on this evidence, the circuit court found that Daniel did not abuse his children and that Laray coached the children to say he did. We hold that these findings are not clearly erroneous. Accordingly, Laray's entire argument that Martha is not suitable is without merit. All that remains is a significant amount of evidence that Martha is suitable. Therefore, we conclude that the circuit court did not clearly err in finding that Martha is a suitable guardian.

Laray's second challenge to the guardianship order is that Martha did not meet her burden of proving that Laray is unfit. She claims that Martha "presented no evidence, no testimony or expert, and no witnesses to prove Laray was an unfit parent."

Martha is not required to prove that Laray is unfit. Section 28-65-204(a) provides that the parent of an unmarried minor, if qualified and, in the opinion of the court, suitable, shall be preferred over all others for appointment as guardian of the person. Ark. Code Ann. § 28-65-204(a) (Repl. 2012). In *Fletcher*, 2010 Ark. 64, at 12, 359 S.W.3d at 420, our supreme court rejected the appellant's argument that a natural parent must be proved unfit before a

guardianship may be entered in favor of someone other than the natural parent. The court

noted that section 28-65-204(a) "makes no mention of whether the natural parent is 'fit' or

'unfit,' as those terms have been used in custody cases." *Fletcher*, 2010 Ark. 64, at 12, 359

S.W.3d at 420. The court held that

> the sole considerations in determining guardianship pursuant to Ark. Code Ann. § 28-65-204(a) are whether the natural parent is qualified and suitable and what is in the child's best interest. To the extent that any of our prior cases suggest a standard of fitness or unfitness in guardianship proceedings involving the statutory natural-parent preference, we overrule them.

*Id.* at 12–13, 359 S.W.3d at 420. Accordingly, we reject Laray's argument that Martha was

required to prove that Laray is unfit.

To the extent Laray argues that Martha failed to prove that Laray is unsuitable, we

disagree. There was an even larger mountain of evidence presented in this case to demonstrate

that Laray is unsuitable. Laray (1) falsely accused Daniel of sexually abusing their children and

coached their children to report the abuse;[11] (2) made reports that D.C. sexually abused H.C.

and his half-sister that were unsubstantiated and caused D.C. to be committed to a long-term-

care facility; (3) manipulated the children by withholding gifts, toys, affection, and even

visitation when they would not say that Daniel was abusing them; (4) was the stated stress-

related cause for H.C.'s and D.C.'s diagnoses (by Hancock) of trichotillomania, an anxiety

disorder that resulted in the children pulling out their hair; (5) was diagnosed by Dr. Deyoub

with borderline personality disorder; (6) denied that she suffered from mental-health issues

and refused treatment; (7) made no child-support payments during the seven-year pendency

---

[11]Laray also published these false allegations on social media.

of the case; (8) violated court orders to pay support from March 11, 2014, forward; (9) authored a letter, after her last visit with the children in January 2014, voluntarily withdrawing from visitation and had not seen the children since that time; (10) failed to provide holiday or birthday gifts, cards, or calls to the children since February 2014; (11) had no home, job, or vehicle at the time of the guardianship hearing;[12] (12) authored a disturbing and threatening email on December 3, 2013, to the attorney ad litem; (13) was involved in a domestic dispute with her husband, Joshua, in April 2013, that resulted in her being "tased" by a police officer and arrested for second-degree battery (she struck a police officer in the face), resisting arrest, second-degree endangering the welfare of a minor, possession of a controlled substance, and first-degree terroristic threatening (she yelled "you fucking bitch you're dead, you're dead you fucking bitch" to another police officer); (14) tested positive for drugs in December 2012; and (15) was found by the attorney ad litem, Hancock, and Dr. Deyoub to be unsuitable. This list is not exhaustive.

Based on this evidence, the circuit court's guardianship order found that Laray is not suitable to serve as guardian of the minor children, that she "engaged in conduct that constitutes the poisoning of the minds of the children," and that she coached the minor children to make untrue statements. The court further found that, based on "days and days of testimony" and after the court had "observed [Laray's] demeanor, manner, inconsistencies in her testimony, and obvious attempt to evade," she is not a credible witness. After considering

---

[12]Laray testified that she was "between homes" as she had separated from Joshua and was living with another man. She further testified that she had been unable to work since 2012 following an automobile accident. Laray arrived at the guardianship hearing with a cast on her leg. She stated that she broke her leg in a motorcycle accident.

all the testimony presented and the circuit court's superior position to weigh and assess the credibility of witnesses and their testimony, we are not left with a definite and firm conviction that a mistake was made by the circuit court when it found that Laray is an unsuitable guardian for her children. Therefore, we affirm the circuit court's order awarding guardianship to Martha.

Affirmed.

GRUBER, C.J., and GLADWIN, J., agree.

*Law Office of Kathryn L. Hudson*, by: *Kathryn L. Hudson*, for appellant.

*McKinney & McKinney, PLLC*, by: *Quincy W. McKinney*, for appellee Martha Coker.