Cite as 2022 Ark. App. 70

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-21-72

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF Z.S., A MINOR | Opinion Delivered February 16, 2022 |
| PAMELIA AND BOBBY SULLINS | APPEAL FROM THE MARION COUNTY CIRCUIT COURT |
| APPELLANTS | [NO. 45PR-19-18] |
| V. | HONORABLE JIM D. SPEARS, JUDGE |
| | AFFIRMED |
| CATHY NELSON | |
| APPELLEE | |

**RAYMOND R. ABRAMSON, Judge**

Pamelia and Bobby Sullins appeal the Marion County Circuit Court order granting Cathy Nelson a guardianship over their grandson, Z.S. (born in May 2017). On appeal, the Sullinses argue that the circuit court erred by (1) finding it was in Z.S.'s best interest to grant Cathy a guardianship and (2) considering the best interest of Z.S.'s mother. We affirm.

Z.S.'s parents are Jessica Sullins Mickelson and Nathan Siebrasse. The Sullinses are Z.S.'s maternal grandparents, and Cathy is Z.S.'s paternal grandmother. On February 15, 2019, Cathy petitioned for a temporary and permanent guardianship over Z.S. She alleged that Jessica and Nathan were unfit and that the Sullinses had physical custody of Z.S. Cathy attached a power of attorney from Nathan consenting to the guardianship.

On June 11, the Sullinses moved to intervene and petitioned for guardianship over Z.S. In their motion, the Sullinses agreed that Jessica and Nathan were unfit to care for Z.S. They stated that Jessica's emotional and financial condition prevented her from caring for Z.S. and that Nathan was incarcerated on first-degree sexual-assault charges. They further asserted that Z.S. had been in their physical custody since his birth except for a six-month period when he lived with Nathan. They noted that even during the six-month period, Pamelia cared for Z.S. during the day.

On June 24, the court granted the Sullinses' intervention motion and awarded them temporary guardianship of Z.S. for ninety days with Cathy having visitation every other weekend from Thursday evening through Sunday evening. The court further ordered that Z.S.'s contact with Jessica and Nathan be supervised.

On February 7, 2020, Jessica filed a waiver and consent to the Sullinses' petition for permanent guardianship of Z.S. On February 13, the court entered an agreed order extending the Sullinses' temporary guardianship and Cathy's visitation. The court further ordered that the parties work together to allow Jessica to have supervised visitation with Z.S., but it prohibited contact with Nathan.

On October 6, the court held a final hearing. At the beginning of the hearing, the parties stipulated that in October 2017 in a separate custody proceeding, Nathan obtained custody of Z.S. with Jessica having supervised visitation. They further agreed that Nathan had been arrested in January or February 2019 and that the Sullinses assumed physical custody of Z.S. at that time.

Lindsay Bickford, Z.S.'s paternal aunt, testified that she is a stay-at-home mom with three sons. She stated that her brother Nathan is bipolar with psychotic features and that he had been charged with sexual assault of his stepdaughter. She explained that prior to Nathan's incarceration—when he had custody of Z.S.—she and Cathy frequently saw Z.S. She stated that following Nathan's arrest, the Sullinses denied them contact with Z.S. from February 2019 through June 2019. She stated Cathy thus initiated the present proceedings.

Lindsay testified that she is concerned about Z.S.'s teeth. She stated that the Sullinses give him an infant bottle containing a sugary substance and that the drink has caused his teeth to rot. She testified that he appears to be in pain when he eats and brushes his teeth. She further stated that the Sullinses had assured her and Cathy that they would seek dental care for Z.S. but that his teeth had not improved. She also testified that Z.S. has difficulty with his speech and that she frequently cannot understand him. During Lindsay's testimony, a photo of Z.S.'s teeth that Cathy took a few weeks before the hearing was introduced.

Lindsay testified that Z.S. has a wonderful relationship with Cathy. She stated that Cathy is healthy and that she is employed at a medical office. She testified that she would help Cathy care for Z.S. if the court awarded Cathy the guardianship.

Cathy testified that she lives alone in a two-bedroom house. She stated that she works part time for Cardiovascular Associates and that she has been employed there for about fourteen years. Cathy testified that she has concerns with Z.S. living with the Sullinses. She testified that Pamelia has health issues. She further stated that Z.S. has a speech delay and

that the Sullinses socially isolate him from other children. She testified that he becomes frustrated due to his inability to communicate. Cathy played a video of Z.S. speaking.[1]

Cathy stated that in April 2018, Nathan took Z.S. to the hospital due to convulsions and that his urine sample was positive for methamphetamine. Cathy read Z.S.'s medical record concerning the incident, but the circuit court sustained the Sullinses' objection concerning the record.

Cathy testified that if she was awarded the guardianship, she would enroll Z.S. in a preschool program that offers speech therapy. She explained that while she is working, Z.S. would attend preschool or Lindsay would care for him.

Jessica testified at the hearing, and she revoked her consent to the Sullinses' having guardianship of Z.S. Jessica requested custody of Z.S.; in the alternative, she asked that the court grant Cathy a guardianship and grant her unsupervised weekend visits. She stated that Cathy is a wonderful grandmother, and she noted that Cathy had facilitated her supervised visits with Z.S. Jessica testified that the Sullinses had initially represented that they wanted to help her obtain custody of Z.S. but that they had "manipulated and tricked" her and now deny her contact with Z.S.

Jessica further testified that she has concerns with Pamelia's health, and she noted that Pamelia had a brain aneurysm that required her to be hospitalized. She stated that

---

[1]On appeal, the Sullinses complain that Cathy failed to formally introduce the video into evidence. However, the transcript shows that the video was played for the circuit court, and the Sullinses did not object to it.

4

Pamelia has a medical-marijuana card and that she smokes a "vape pipe" and a "normal marijuana pipe" with THC oil near Z.S. Jessica further stated that the Sullinses have not taken Z.S. to receive any vaccinations because he is constantly sick.

Jessica stated that she last used methamphetamine about three years ago and that she occasionally drinks beer. She stated that in May 2020, she was arrested for public intoxication. She stated that she is now married to Jerrod Mickelson and that he has abused drugs and alcohol.

Pamelia testified that she and Bobby live in a three-bedroom house on a two-acre lot and that Z.S. has his own room with numerous toys. She explained that she began caring for Z.S. when he was an infant while Jessica worked and that she continued to provide day care for him during the day when Nathan had custody. She stated that her and Bobby's relationship with Jessica deteriorated because they do not tolerate her drug problem and her husband's alcoholism. She testified that Z.S. does not know Jessica and that she is not convinced Jessica is sober.

Pamelia asked the court to appoint her and Bobby as Z.S.'s guardians because Z.S. is bonded to them, and they are dedicated to raising him. She further stated that they never denied Cathy and Lindsay visitation with Z.S. She explained that her previous attorney advised her and Bobby not to leave Z.S. alone with Cathy and Lindsay until they obtained a temporary guardianship. She stated that they have always allowed Cathy and Lindsay to visit Z.S. at their home.

As to her health, Pamelia testified that she was diagnosed with spinal meningitis in 2018 but that doctors initially thought she had a brain aneurysm. She further stated that about ten years ago, she was thrown from a horse and hurt her back. She explained that due to the back injury, she took hydrocodone for pain but no longer needs the medication.

As to Z.S.'s teeth, Pamelia testified that Z.S. has been to two dental appointments but, due to the COVID-19 pandemic, she stopped taking him. She further stated that she had to cancel his last appointment for a sinus infection but that she had rescheduled the appointment. She testified that Z.S. stopped using a bottle about six months ago, and she explained that she puts a strawberry probiotic in his milk and also gives him organic cherry juice. She further stated that she had discussed Z.S.'s speech issue with a physician in Mountain Home. She testified that she is considering enrolling Z.S. in a Montessori preschool and had signed him up for ABC Mouse, a preschool program.

Pamelia stated that Z.S. does not like her to leave him with Cathy. She testified that when he returns from weekend visits with Cathy, he has nightmares. She testified that he sleeps at both Lindsay's house and Cathy's house and that he becomes confused on where he is sleeping.

Bobby testified that he has been employed at a catastrophe-adjusting firm for about seventeen years and that he travels for periods of about a month to forty-five days. He acknowledged that after Z.S. had ingested methamphetamine, Nathan did not allow Z.S. in their home from April 2018 through December 2018. He stated that Nathan allowed them to talk to Z.S. on the phone.

Lori Bigelow testified that she is Z.S.'s maternal aunt. She testified that she has no concerns with Pamelia caring for Z.S., and she stated that she trusts Pamelia to care for her own children. She testified that she has never seen Pamelia care for Z.S. while under the influence of marijuana.

Following the hearing, on October 27, the court entered an order granting Cathy guardianship of Z.S. and awarding the Sullinses visitation every other weekend from Thursday evening through Sunday evening. The court noted that "[c]ontact with the Sullins[es] is very important as the child has been in their care for most of his life." The court stated, "In reaching these findings, the Court has taken into consideration the demeanor of the witnesses and their attitude toward the other parties and the probability of their working together for the best interest of the child and his mother." The court further found both Jessica and Nathan unfit. On the same day the court entered the guardianship order, Nathan filed a consent and waiver to Cathy's guardianship. This appeal followed.

We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Mossholder v. Coker*, 2017 Ark. App. 279, 521 S.W.3d 150. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.*

Arkansas Code Annotated section 28-65-210 (Repl. 2012) provides that before appointing a guardian, the court must be satisfied that (1) the person for whom a guardian is prayed is either a minor or otherwise incapacitated; (2) a guardianship is desirable to

protect the interests of the incapacitated person; and (3) the person to be appointed guardian is qualified and suitable to act as such. When the incapacitated person is a minor, the key factor in determining guardianship is the best interest of the child. *Fletcher v. Scorza*, 2010 Ark. 64, 359 S.W.3d 413.

On appeal, the Sullinses first argue that the circuit court erred by finding that it was in Z.S.'s best interest to appoint Cathy as guardian. They assert that Z.S. has lived with them for most of his life and that they have acted as his parents. They further assert that Cathy offered no proof that they failed to appropriately care for Z.S., and they argue that her guardianship destroys their relationship with Z.S.

We hold that the circuit court did not err by finding that it was in Z.S.'s best interest to appoint Cathy as his guardian. Even though Z.S. had lived with the Sullinses immediately preceding the guardianship proceedings, the evidence showed that Z.S. has a relationship with Cathy and that Z.S. had lived with his father, Nathan, for an extended period. Cathy also presented evidence concerning the Sullinses' inattention to Z.S.'s health.[2] Moreover, there was evidence that when the Sullinses had custody of Z.S., they denied Cathy and Jessica

---

[2]In their brief, the Sullinses suggest that Cathy should have offered medical testimony concerning Z.S.'s teeth and speech. However, the Sullinses have not raised an evidentiary issue on appeal, and they do not otherwise develop the argument. We do not research or develop arguments for parties. *Bentley v. Bentley*, 2020 Ark. App. 254.

contact with Z.S. The court nevertheless recognized Z.S.'s bond to the Sullinses, and it awarded them visitation every other weekend.[3]

In cases involving children, we afford even more deference to the circuit court's findings because, as our appellate courts have made clear, there is no other case in which the superior position, ability, and opportunity of the circuit court to observe the parties carries a greater weight than one involving the custody of a child. *Galli v. Jones*, 2021 Ark. App. 302, 627 S.W.3d 434; *Sherland v. Sherland*, 2015 Ark. App. 342, 465 S.W.3d 3. Given these circumstances, we are not left with a definite and firm conviction that the court made a mistake by finding that it was in Z.S.'s best interest to appoint Cathy as his guardian.

The Sullinses additionally argue that the circuit court erred by applying a best-interest-of-the-mother standard in making the guardianship determination. They rely on the court's statement that it took into consideration "the demeanors of the witnesses and their attitudes toward the other parties and the probability of their working together for the best interest of the child *and his mother*." (Emphasis added.) The Sullinses argue that the statement demonstrates that the court emphasized the restoration of Jessica's custody over Z.S.'s best interest.

We disagree with the Sullinses' interpretation of the circuit court's order. There was evidence that the Sullinses had denied Jessica contact with Z.S. while Cathy had permitted

---

[3]The Sullinses also complain about testimony suggesting that Z.S.'s methamphetamine ingestion occurred at their home. At the bench trial, the court sustained the Sullinses' hearsay objection. Moreover, the court stated in its order that "it is not established from where the methamphetamine was sourced."

her supervised visits, and the circuit court merely considered Z.S.'s relationship with his biological mother in determining his best interest. Accordingly, we find no reversible error.

Affirmed.

HARRISON, C.J., and GLADWIN, J., agree.

*Jeremy B. Lowrey*, for appellants.

*Maureen H. Harrod*, for appellee.