Cite as 2025 Ark. App. 292

# ARKANSAS COURT OF APPEALS
### DIVISION II
No. CV-23-679

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF MC, A MINOR | Opinion Delivered May 7, 2025 |
| SANDRA ANDRACA<br><br>APPELLANT | APPEAL FROM THE POPE COUNTY CIRCUIT COURT [NO. 58PR-20-205] |
| V. | HONORABLE GORDON W. "MACK" MCCAIN, JR., JUDGE |
| PATRICIA TICE<br><br>APPELLEE | REVERSED AND REMANDED |

**WENDY SCHOLTENS WOOD, Judge**

Sandra Andraca appeals the Pope County Circuit Court's order awarding a permanent guardianship of her now fourteen-year-old daughter, Minor Child (MC) (DOB April 5, 2011), to MC's paternal grandmother, Patricia Tice. Sandra contends that there is no need for a guardianship, a guardianship is not in MC's best interest, and to impose one on this record is a violation of her constitutional rights to raise her child. We hold that the circuit court erred in determining that a guardianship is necessary in this case. Accordingly, we reverse the court's amended final order of guardianship and remand for the court to enter an order granting Sandra full custody of MC.

Sandra is MC's biological mother. Jonathan Goodin, now deceased, was MC's biological father and Patricia's son. Sandra and Jonathan were never married. Sandra was

born in Mexico and entered the United States unlawfully twenty-two years ago when she was twenty-two years old. Jonathan, Sandra, and MC lived with Patricia in her home in Atkins from the time MC was three years old until she was eight. On November 29, 2019, Sandra left Patricia's home with MC. However, in December 2019, MC was ordered to live with Patricia pursuant to an emergency order of guardianship entered in a separate proceeding.[1] Jonathan lived with Patricia and MC until he passed away on July 28, 2020.

The day following Jonathan's death, July 29, Patricia filed a petition for temporary and permanent guardianship of MC, who was still living with Patricia. In support of her July 2020 petition, Patricia alleged that Sandra is an "illegal alien," has a criminal record, "has difficulty maintaining and or getting employment in part due to her illegal status," has no driver's license, and has difficulty obtaining stable housing. The circuit court entered an ex parte emergency order on July 30 awarding Patricia emergency guardianship over MC.

On August 5, the court held a probable-cause hearing on the emergency order. Patricia testified that Sandra, Jonathan, and MC had lived in Patricia's home for five or six years and that Jonathan, with Patricia's help, had done most of the caretaking for MC. Patricia said that Sandra did not have a valid driver's license, and Patricia had "no idea" if

---

[1]Patricia's petition alleged that when Sandra and MC moved out in November 2019, Patricia believed that Sandra was not properly caring for MC. On December 20, Patricia filed a petition for emergency guardianship of MC in the Pope County Circuit Court in case No. 58PR-19-379. That day, the circuit court entered a temporary emergency order of guardianship, and MC began living with Patricia. Patricia alleged that when the 2019 temporary guardianship expired (in June 2020), MC was still living with Patricia and Jonathan. On July 1, Jonathan filed a custody action against Sandra, but he passed away before the case was heard.

Sandra had transportation. Patricia did not know if Sandra had a house or an apartment and did not have any knowledge about Sandra's employment. Patricia also testified that Sandra is an illegal immigrant and that she "would think" it would be "difficult for her to obtain housing or employment" with that status.

Sandra's attorney objected, arguing that Sandra's immigration status was not relevant to her ability to parent MC. The court overruled Sandra's relevance objection, reasoning that it must consider her status in terms of her employment and "also in terms of at any point in time that person could be removed from the child's presence."

Sandra testified that she, Jonathan, and MC moved in with Patricia when Jonathan lost his job. She said that she paid three hundred dollars a month in rent to Patricia while they lived there and purchased food and clothing for MC. She stated that she and Patricia did not get along when she lived in Patricia's home, alleging that Patricia yelled at her, called her a "whore," and mistreated her. She said that Jonathan did not work and that she moved out of Patricia's home in November 2019 because she could not put up with Jonathan's "mistreatment and the yelling." She said she did not call the police about the mistreatment because Jonathan told her he would call immigration and take MC away. She said she lived with her sister, then at a safe house, and later with a friend before renting a trailer in Russellville from her sister and brother-in-law in February 2020. She said that she had seen MC only twice since the December 2019 emergency order entered in the prior case and that since March 2020, Patricia had prevented her from seeing MC at all due to "the virus."

Sandra testified that her utilities were in her brother-in-law's name as the owner of the trailer. She provided photos of the trailer, which the circuit court stated appeared "clean and neat." The photos depict a home with two bedrooms, one bathroom, a living area, a dining area, and a kitchen. Sandra testified that she worked at a Mexican restaurant in Dardanelle and rode to work either in a taxi or with her sister. She said she had worked for her previous employer, Twin Rivers, for ten years but had been fired for "working under a false identity." She said that she was no longer working under a false identity and was paid in cash. Sandra testified that she has sufficient income and a home; that her adult daughter, Jennifer Andraca, and Sandra's minor son live with her; and that she has sufficient family living nearby, stating that her sisters and her brother are legal residents of the United States and live in Russellville. Finally, she testified that she does not have legal status but had contacted an attorney and was saving money to start the process.

The circuit court entered a temporary order on August 28 awarding guardianship to Patricia and finding Sandra "unfit" due to her "immigrant status, her short history of employment, short history of stable housing, the lack of transportation, and lack of a valid driver's license." The court ordered the parties to come up with a visitation schedule of approximately equal time, which they did: MC lives with Sandra every other week.

A hearing regarding permanent guardianship was held via Zoom on January 14, 2021. Patricia testified that she has an appropriate home for MC, that MC has been living week on/week off with the parties, and that MC "seems to be taken care of" when she is with Sandra. Patricia said that her health-insurance policy through her employer would cover MC

4

if she were awarded a permanent guardianship. Patricia also said that she has been interacting with MC's teachers since the temporary guardianship had been in place and that MC is doing well in school.

Sandra testified that she had changed jobs since the temporary hearing and was working at a Mexican grocery store from 8:00 a.m. to 2:00 p.m. every day. She took the job because it allowed her to take MC to school, pick her up after school, and spend time with her. She testified that she is paid in cash each week. According to her affidavit of financial means, Sandra's monthly income is $1520, and her monthly expenses are $1102. She said that the affidavit did not include additional funds that she receives from her adult daughter, Jennifer, for half of the rent, food, and utilities.[2] Sandra testified that her sister provides transportation for her and MC and that other family members help with transportation as needed, or she uses a taxi. Sandra said that she is still living in the trailer she rents from her sister and brother-in-law and that her minor son and Jennifer live with her and share one of the bedrooms, which contains two beds. She said that when she has custody of MC, MC sleeps with her. She stated that she does not have internet service in the trailer but that her sister, who lives five minutes away, does. Finally, she testified that she would not object to Patricia's having frequent and liberal visitation with MC because MC loves Patricia.

---

[2]Jennifer testified that she lives with her mother and "splits" rent and utilities with her. Jennifer further testified that her mother would be able to support MC if Jennifer did not reside in the home.

In closing argument, Patricia's counsel contended that Sandra is "an illegal" who does not pay taxes, had worked under a false identity, and is unable to obtain a driver's license or housing "on her own." He compared her to someone who is "dealing methamphetamine and otherwise capable of parenting," that her status is a "continuing criminal enterprise," and that she could be "yanked up at any time." He said that this was Patricia's basis for permanent guardianship.

In response, Sandra's counsel objected to the characterization of Sandra as engaging in a continuing criminal enterprise, stating that she had used an alias before but was not now and that she has sufficient income, an adequate home, and transportation to provide for MC. Counsel admitted that Sandra is subject to arrest but reminded the court that she had not been arrested and that a guardianship is not necessary for a future event that might never occur. He argued that a guardianship is appropriate only when it is necessary and that it is not necessary when a mother has the resources to provide for her children and does so.

On February 1, 2021, the circuit court entered a permanent guardianship order first finding that MC was "in need of a guardianship . . . by reason of minority." The court then found that Sandra is "unfit" and that Patricia was "qualified to serve" and was "the fit and proper person" to serve as MC's guardian. Regarding Sandra's "fitness," the circuit court found:

> [Sandra's] immigration status as an undocumented immigrant is not the controlling factor, but her status causes other collateral results that impair her fitness as a parent and her ability to provide necessities for her child. She cannot obtain a driver's license and therefore cannot provide for transportation of the minor child without depending on others, her status impairs her ability to obtain work in that she has to

6

work for cash, she has no ability to provide utilities for her family in her name, but has to depend on others to set up utilities in their name, she is potentially subject to arrest due to her legal status. She does not have the ability to provide an internet account her child can utilize for her educational needs, but has to depend on others for that as well. Her current housing is inadequate in that she has a two-bedroom home and her adult daughter and teenage son live there and the ward is forced to share a room with [Sandra].

The court continued the alternating weekly visitation schedule between the parties.

Sandra filed an appeal from the circuit court's order, arguing that there was no showing that a guardianship was necessary or in MC's best interest and that it violates her constitutional right to raise her child. Sandra specifically contended that the first question the court should have answered was whether a guardianship was necessary or "desirable" and not whether she was "fit." *See In re Guardianship of A.P.G.*, 2022 Ark. App. 325, at 9, 652 S.W.3d 602, 607 (*Guardianship I*). This court stated that our supreme court has held that "fitness" is not an element in an initial guardianship case as opposed to a termination-of-guardianship case.[3] In order to conduct a proper review of the case, this court reversed and remanded for the circuit court to enter additional findings consistent with the guardianship

---

[3]In a termination-of-guardianship case, the supreme court has held that a guardianship is no longer necessary when a fit parent revokes consent. *In re Guardianship of W.L.*, 2015 Ark. 289, at 7, 467 S.W.3d 129, 133. The court stated that the "fit parent" does not have to prove anything else. *Id.* at 8, 467 S.W.3d at 134. We note that the legislature amended the termination-of-guardianship statute in 2017 to allow a court to terminate a guardianship if it is no longer necessary *and* no longer in the best interest of the ward. Ark. Code Ann. § 28-65-401(b)(3) (Supp. 2023). Before the amendment, the grounds for termination were in the alternative that the guardianship is no longer necessary *or* no longer in the best interest of the ward. *Compare* Ark. Code Ann. § 28-65-401(b) (Supp. 2023) (use of conjunctive "and") *with* Ark. Code Ann. § 28-65-401(b)(3) (Repl. 2012) (use of disjunctive "or").

statutes: whether Sandra was qualified and suitable under Arkansas Code Annotated section 28-65-204; whether a guardianship was "desirable to protect" MC's interests under section 28-65-210; and, if a guardianship was desirable, whether Patricia was "qualified and suitable" to act as MC's guardian under section 28-65-210. *Id.* at 10–11, 652 S.W.3d at 607–08. We also ordered the circuit court to make findings regarding MC's best interest, which the supreme court has held is "paramount" in guardianship cases involving the parent-preference statute. *Id.* at 10, 652 S.W.3d at 608; *see also Fletcher v. Scorza*, 2010 Ark. 64, at 14, 359 S.W.3d 413, 421.

On remand, the circuit court entered an amended final order of guardianship on June 22, 2023. Regarding Sandra's qualification and suitability, the court first recognized that, as the sole surviving parent of MC, Sandra has a "preference above all others." The court then found that Sandra "remains unsuitable to hold the position of guardian based on the facts and circumstances and conclusions of law" set forth in its February 1, 2021 permanent- guardianship order and the additional findings set forth in its amended order. The court then specifically addressed the necessity of a guardianship, finding: "Due to the mother of the minor child being unsuitable to adequately care for the minor child a guardianship is found to be required to protect the minor child's interests and to provide for the minor child's care based on the child's minority and inability to care for herself." Finally, the circuit court made extensive findings regarding whether a guardianship is in MC's best interest:

8

This Court finds that it is in the best interest of the minor to appoint the Paternal Grandmother, Patricia L. Tice, as the child's permanent guardian and she shall serve without bond. The guardianship shall remain in place until such time as the conditions that resulted in the finding that the mother is unsuitable and unfit to be the child's guardian are remedied. The basis for this determination is found in the trial record, this Court's order of permanent guardianship filed for record February 1, 2021, as well as the findings of fact and conclusions of law set out herein. The mother's counsel argued at trial that, *"the mother's immigration status is not relevant to the mother's ability to parent."* Counsel for the mother further argued that *"the fact the mother is in this country illegally has no bearing on her ability to provide, to be a good parent and to provide housing, shelter and all the other basic necessities of life, she can provide for her daughter."* The Court finds that counsel's argument is clearly not supported by the evidence submitted at trial. Counsel for the mother wants this Court to create a special class of residents that are given dispensation from providing the standard of care required of parents with regard to their children simply because the parent is undocumented. The question before this Court is simply whether the child's care, maintenance, health, education, security and general welfare are being provided, whether the parent is a citizen, documented alien or undocumented alien. The focus must be on the child. The creation of a special class of parents that are held to a lesser standard would result in the creation of a special class of children that are not afforded an equal level of protection by the Courts that should be provided to all children. This Court does not have the authority to provide to the mother special consideration due to her immigration status. Throughout the trial in this matter there was absolutely no evidence or even argument that the mother had at any time during the minor's life independently provided any of the bare necessities for the minor's care. There was always someone else supporting the child or helping to support the child as to the provision of housing, transportation, food, clothing, medical care and the like. During the several months prior to the final hearing in this matter, the mother had very little responsibility for the minor financially or otherwise, and yet she could not live independent of others' support. But for the mother's adult child assisting with the daily costs of living the mother's income did not meet the basic standard of living she enjoyed. Income alone is not the controlling factor in determining the need for guardianship of a minor, many good parents are of meager means. The fact a parent receives government assistance with housing, medical care, food stamps and the like are not a mark of failed parenting. However, when a parent has, as the mother here has done, refuses or without justification fails to take steps available to improve their economic standing in order to independently raise their child, the economic circumstances are, as in this case, worthy of greater weight. The mother, by her own testimony, indicated she knew that her immigration status created financial hardship for her. The mother testified that she was saving money to acquire counsel to assist her in achieving a documented status. She has been in this

country for over twenty years and only now has decided to seek legal status. That is indicative of a person that is content to rely on the support of others, in this case, her adult daughter and other family members. The focus of this Court is to determine the circumstances requiring a guardianship, specifically setting forth the basis, informing the parent of the need to address the circumstances, maintaining a good relationship between the parent and the child during the pendency of the guardianship and creating a mechanism to facilitate reunification of the child and the parent in a home where the child's needs are met by the parent. The mother has long before now recognized the need to improve her independence and thus her ability to provide for her children. The child should not be subjected to the daily negative aspects of the mother's delay in that endeavor.

It is in the child's best interest that the Paternal Grandmother, Patricia L. Tice, be appointed permanent guardian of the minor child until such time as the mother improves her ability to adequately provide for the child's safety, security, housing, clothing, medical care and overall daily necessities.

(Emphasis in original.) This appeal followed.

We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Mossholder v. Coker*, 2017 Ark. App. 279, at 8, 521 S.W.3d 150, 155. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Guardianship I*, 2022 Ark. App. 325, at 8, 652 S.W.3d at 606–07. When reviewing the proceedings, we give due regard to the opportunity and superior position of the circuit court to determine the credibility of the witnesses. *Fletcher*, 2010 Ark. 64, at 10, 359 S.W.3d at 420.

Sandra's first argument on appeal is that the circuit court clearly erred in finding that MC is in need of a guardianship. Guardianships are special proceedings governed by statutory law. *In re Guardianship of W.L.*, 2015 Ark. 289, at 5, 467 S.W.3d at 132. A guardian

may be appointed for an "incapacitated person," and minors under the age of eighteen are defined as "incapacitated persons." Ark. Code Ann. § 28-65-201(a) (Repl. 2012) & § 28-65-104(1) (Supp. 2023). Therefore, due to her minority, MC is among the class of people for whom a guardian may be appointed. However, a guardian is not appointed merely because a person is incapacitated due to his or her minority status. Arkansas Code Annotated section 28-65-105 provides:

> Guardianship for an incapacitated person shall be:
>
> (1) Used only as is *necessary* to promote and protect the well-being of the person and his or her property;
>
> (2) Designed to encourage the development of maximum self-reliance and independence of the person; and
>
> (3) Ordered only to the extent necessitated by the person's actual mental, physical, and adoptive limitations.

Ark. Code Ann. § 28-65-105(1)–(3) (Repl. 2012) (emphasis added). A circuit court's order establishing guardianship shall contain findings of fact that the respondent is an incapacitated person and is in *need* of a guardian. Ark. Code Ann. § 28-65-214(a) (Repl. 2012) (emphasis added). "Necessary" is not defined in the statute. The dictionary definition of "necessary" is "absolutely needed: required." *See* https://www.merriam-webster.com/dictionary /necessary (accessed April 28, 2025). Absent a statutory definition for a term, this court has used a dictionary definition of a term found in a statute to determine its plain meaning. *See Wade v. State*, 2009 Ark. 346, at 5, 300 S.W.3d 178, 182.

Section 28-65-210 is also relevant to the analysis and provides:

11

Before appointing a guardian, the court must be satisfied that:

(1) The person for whom a guardian is prayed is either a minor or otherwise incapacitated;

(2) A guardianship is *desirable* to protect the interests of the incapacitated person; and

(3) The person to be appointed guardian is qualified and suitable to act as such.

Ark. Code Ann. § 28-65-210(1)–(3) (Repl. 2012) (emphasis added).[4] "Desirable" is not defined in the statute, but according to its dictionary definition, desirable in this context is synonymous with prudent or advisable. *See* https://www.merriam-webster.com/dictionary/desirable (accessed April 28, 2025). These statutes do not contemplate the appointment of a guardian for any child at any time: it must be necessary—absolutely needed or required—and desirable—prudent or advisable.

With this statutory text in mind, we hold that the circuit court clearly erred in determining that a guardianship was "necessary to promote and protect" MC's well-being under section 28-65-105(1) and "desirable" to protect MC's interests as required by section 28-65-210(2). It was undisputed that Sandra was employed and that her income, even without considering the funds she received from her adult daughter, was more than enough

---

[4]Notably, *if* a guardianship is necessary and desirable, then there is a statutory preference for a parent. This statute provides that the "parents of an unmarried minor, or either of them, if qualified and, in the opinion of the court, suitable, shall be preferred over all others for appointment as guardian of the person." Ark. Code Ann. § 28-65-204(a) (Repl. 2012). The sole considerations in determining the parental preference in a guardianship of a child are whether the natural parent is qualified and suitable and what is in the child's best interest. *Guardianship I*, 2022 Ark. App. 325, at 9–10, 652 S.W.3d at 607.

to cover her and MC's expenses. It was also undisputed that, while Sandra did not have a driver's license, she had transportation through family members and taxis. No evidence was presented that either she or MC had ever missed work, school, or any other event for lack of transportation. Indeed, the parties agreed that custody exchanges were going well, and transportation had not been an issue. Although the trailer in which Sandra lived did not have internet service at the time of the hearing, Sandra testified that her sister, who lived five minutes away, did have internet service. And there was no evidence presented that internet service was required for MC's education or that Sandra or her brother-in-law could not get internet service in the trailer if necessary. Finally, the court's concern that MC did not have her own bedroom at Sandra's home simply does not mandate the removal of a child from her family and the appointment of a third-party guardian who can supply this. Patricia admitted that Sandra's home is adequate, the court stated the home is "clean and neat," and the court awarded visitation of every other week to Sandra. *See In re Guardianship of W.L.*, 2015 Ark. 289, at 14, 467 S.W.3d at 137 (holding that a circuit court's award of extended, unsupervised visitation provides strong evidence that the parent is fit). *See also Orantes v. Orantes*, 2011 Ark. 159, at 8, 381 S.W.3d 758, 764 (rejecting parent's argument that his three-bedroom, two-bathroom home provided a more loving and stable environment for the child because it permitted her to have her own bedroom and bathroom, in contrast to the mother's two-bedroom, one-bathroom home where seven persons lived, reasoning that "merely because one parent has more resources or income is not a basis upon which to change custody"). Indeed, the lengthy and successful every-other-week visitation MC has had

13

with Sandra since August 2020 negates the purported necessity of a guardianship to protect MC's well-being and minimizes the desirability to protect her interest.

In our de novo review, the record reveals that Sandra provides MC appropriate housing, food, clothing, and transportation. MC regularly attends school and, according to Patricia, is doing well. By all accounts, Sandra is providing for MC's security and general welfare. There is no evidence to the contrary.

In conclusion, this court is left with a definite and firm conviction that a mistake has been made. While we give great deference to the circuit court's credibility determinations, we conclude that the court's finding that guardianship is necessary and desirable to promote and protect MC's well-being and interests is clearly erroneous. On the contrary, the undisputed evidence in this case demonstrates that Sandra is more than adequately caring for MC. Therefore, we reverse the circuit court's amended final order of guardianship and remand for the court to enter an order terminating the guardianship and granting Sandra full custody of MC.[5]

Reversed and remanded.

GLADWIN and THYER, JJ., agree.

*David R. Horn* and *Robert S. Tschiemer*, for appellant.

*Michael S. Robbins*, for appellee.

---

[5]In light of this holding, we need not reach Sandra's other arguments on appeal that challenge the circuit court's best-interest findings and the constitutionality of the circuit court's amended guardianship order.

*John C. Williams*, Arkansas Civil Liberties Union Foundation; and *Lee Gelernt*, *Stephen B. King*, and *Noelle Smith*, American Civil Liberties Union Foundation, Immigrants' Rights Project, amici curiae in support of appellant on behalf of the ACLU Immigrants' Rights Project, the ACLU of Arkansas, Arkansas Advocates for Children and Families, and the Hispanic Women's Organization of Arkansas.

*Brian G. Brooks*, for amicus curiae Arkansas Trial Lawyers Association.